IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| ROOSEVELT ARTHUR WILLIAMS, | ) | 2 CA-SA 2012-0070 |
| | ) | DEPARTMENT A |
| Petitioner, | ) | |
| | ) | O P I N I O N |
| v. | ) | |
| | ) | |
| HON. PETER J. CAHILL, Judge of the | ) | |
| Superior Court of the State of Arizona, in | ) | |
| and for the County of Pima, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE STATE OF ARIZONA, | ) | |
| | ) | |
| Real Party in Interest. | ) | |
| | ) | |

SPECIAL ACTION PROCEEDING

Pima County Cause No. CR20103630001

JURISDICTION ACCEPTED; RELIEF DENIED

Lori J. Lefferts, Pima County Public Defender
 By Sean Bruner and Dawn Priestman                                    Tucson
                                                            Attorneys for Petitioner

Barbara LaWall, Pima County Attorney
 By Jacob R. Lines                                                   Tucson
                                                  Attorneys for Real Party in Interest

H O W A R D, Chief Judge.

**¶1**     In this statutory special action, Roosevelt Williams challenges the respondent judge's ruling that he failed to establish, by clear and convincing evidence, an intellectual disability rendering him ineligible for the death penalty in his pending prosecution for murder. Our consideration of the merits of Williams's petition is mandatory. *See* A.R.S. § 13-753(I). For the following reasons, we deny relief.

## Background

**¶2**     As a matter of statutory and constitutional law, a person convicted of a capital offense who suffers from an intellectual disability, previously known as mental retardation, may not be sentenced to death. § 13-753(H); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (Eighth Amendment prohibits execution of mentally retarded persons).[1] Under § 13-753(K)(3), an intellectual disability is defined as follows:

> [A] condition based on a mental deficit that involves significantly subaverage general intellectual functioning, existing concurrently with significant impairment in adaptive behavior, where the onset of the foregoing conditions occurred before the defendant reached the age of eighteen.

---

[1]Since *Atkins* was decided, the American Association on Intellectual and Developmental Disabilities (AAIDD), formerly known as the American Association on Mental Retardation (AAMR), has changed the designation of this disability from "mental retardation" to "intellectual disability." *See Coleman v. State*, 341 S.W.3d 221, 226 n.5 (Tenn. 2011) (noting change; terms "mental retardation" and "intellectual disability" "interchangeable"); Robert L. Schalock et al., *The Renaming of* Mental Retardation*: Understanding the Change to the Term Intellectual Disability*, 45 Intell. & Developmental Disabilities 116, 120 (2007) ("intellectual disability" "currently preferred term" for mental health profession to describe same "population of individuals who were diagnosed previously with mental retardation in number, kind, level, type, and duration of the disability"). Consistent with this change in terminology, § 13-753 was amended in 2011 to substitute "intellectual disability" for "mental retardation" with no substantive changes to the statute. *See* 2011 Ariz. Sess. Laws, ch. 89, § 5.

The statute further defines "[s]ignificantly sub-average general intellectual functioning" as "a full scale intelligence quotient of seventy or lower," taking into account "the margin of error for the test administered." § 13-753(K)(5). "'Adaptive behavior'" is defined as "the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group." § 13-753(K)(1).

¶3        Williams was indicted for two counts of first-degree murder, and the state filed a notice of its intent to seek the death penalty. In accordance with § 13-753(B), the respondent judge appointed a "prescreening psychological expert" to evaluate Williams's intelligence quotient (IQ). Upon that expert's report that Williams's IQ test score was less than seventy-five, the respondent appointed additional experts and scheduled an evidentiary hearing to determine whether Williams suffers from an intellectual disability and therefore is ineligible for a death sentence. *See* § 13-753(D).

¶4        After the evidentiary hearing, the respondent judge found Williams had "met his burden of showing that, at least currently, he presents with significantly sub-average general intellectual functioning" based on "[t]wo valid IQ test scores" of sixty-eight and seventy and the neuropsychological assessment performed by defense expert James Sullivan.[2] But the respondent further found Williams had "not met his burden of showing that the mental impairment existed concurrently with significant adaptive

_____

[2]Sullivan administered the Wechsler Adult Intelligence Scale 4 (WAIS-4), and reported Williams had a full-scale IQ of seventy, with ninety-five percent confidence that his "true IQ" would fall between sixty-seven and seventy-five. Psychologist Serena Gorgueiro administered the Stanford-Binet 5 and reported Williams had a full-scale IQ of sixty-eight, with a range of sixty-five to seventy-three.

3

behavior impairment or that the onset of the conditions occurred before [he] reached the age of [eighteen]." Accordingly, the respondent denied Williams's request to dismiss the state's notice of its intent to seek the death penalty.

¶5 For the most part, Williams does not dispute the respondent judge's thorough summary of the evidence presented at the hearing. Instead, he contends the respondent abused his discretion in applying § 13-753 "in such a manner that it violated the Eighth Amendment to the United States Constitution and article II § 15 of the Arizona Constitution." But Williams does not articulate clearly the basis for a constitutional claim; instead, he challenges the respondent's reliance on certain evidence and his rejection of other evidence in concluding Williams had failed to sustain his burden of proof. According to Williams, clear and convincing evidence not only established that he suffers from impairments in intellectual and adaptive functioning contemplated by § 13-753, but also established, as required, that the onset of these conditions occurred before the age of eighteen.

**Discussion**

¶6 At a hearing conducted in accordance with § 13-753, "the defendant has the burden of proving intellectual disability by clear and convincing evidence." § 13-753(G); *see also State v. Grell* (*Grell II*), 212 Ariz. 516, ¶ 29, 135 P.3d 696, 702 (2006) (statute's burden of proof requirements constitutionally permissible). We defer to the respondent judge's factual findings if they "are supported by the record and not clearly erroneous." *State v. Rosengren*, 199 Ariz. 112, ¶ 9, 14 P.3d 303, 307 (App. 2000). Moreover, a trial judge "'has broad discretion in determining the weight and credibility given to mental

4

health evidence'" presented in an *Atkins* hearing. *Grell II*, 212 Ariz. 516, ¶ 58, 135 P.3d at 708, *quoting State v. Doerr*, 193 Ariz. 56, ¶ 64, 969 P.2d 1168, 1181 (1998). We review legal questions, including questions of constitutional law, de novo, *id.* ¶¶ 22, 55, but we will not upset a legal determination that evidence was insufficient to meet a clear and convincing standard unless we can say "as a matter of law that no one could reasonably find that the evidence . . . was less than clear and convincing." *Groth v. Martel*, 126 Ariz. 102, 103, 612 P.2d 1065, 1066 (App. 1979); *see also State v. West*, 226 Ariz. 559, ¶ 15, 250 P.3d 1188, 1191 (2011) ("[Q]uestion of sufficiency of the evidence is one of law . . . .").

¶7 In *Atkins*, the United States Supreme Court held that executing a mentally retarded offender violates the Eighth Amendment's ban on cruel and unusual punishment. 536 U.S. at 321. The Court announced this categorical rule based on a "national consensus," evinced by prohibitions enacted by state legislatures, that mentally retarded persons are "categorically less culpable than the average criminal" and more vulnerable to wrongful execution. *Id.* at 315-21. According to the Court, "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." *Id.* at 317.

¶8 The Court cited clinical definitions of mental retardation found in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) (DSM-IV), published by the American Psychiatric Association (APA), and Mental Retardation: Definition, Classification, and Systems of Supports (9th ed. 1992), published by the

5

American Association on Mental Retardation (AAMR),[3] stating that both definitions require evidence of "subaverage intellectual functioning . . . [and] significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age [eighteen]."[4] *Id.* at 318 & n.3. Adopting the approach it chose when it prohibited execution of offenders who are insane, the Court left "'to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences,'" noting that "statutory definitions of mental retardation" in states that legislatively had prohibited execution "are not identical, but generally conform to the clinical definitions" promulgated by the APA and the AAMR. *Id.* at 317 & n.22, *quoting Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986) (alterations in *Atkins*).

¶9 Arizona is among the states that had enacted legislation prohibiting the execution of mentally retarded offenders before *Atkins* was decided. *Id.* at 315; *State v.*

---

[3]Now the American Association on Intellectual and Developmental Disabilities (AAIDD), *see supra* note 1.

[4]This description continues to be accurate. The AAIDD since has modified diagnostic criteria that had required "'limitations in at least 2 of the 10 specific skill areas listed in [the AAMR's] 1992 definition'" and had been "the model for the approach still used by the APA." *United States v. Hardy*, 762 F. Supp. 2d 849, 879 (E.D. La. 2010), *quoting* AAMR, *Mental Retardation Definition, Classification, and Systems of Supports* 73 (10th ed. 2002) [hereinafter AAMR 10th Edition] (alteration in *Hardy*); *see also Atkins*, 536 U.S. at 309 n.3. Since 2002, the AAMR/AAIDD has defined the disability as "'characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills'" that originate before age eighteen, explaining that using these "'three broader domains of conceptual, social, and practical skills'" to identify adaptive limitations is "'more consistent with the structure of existing measures and with the body of research on adaptive behavior.'" *Hardy*, 762 F. Supp. 2d at 852, 879, *quoting* AAMR 10th Edition at 1, 73, 78.

*Grell* (*Grell I*), 205 Ariz. 57, ¶ 38, 66 P.3d 1234, 1240 (2003); *see also* 2001 Ariz. Sess. Laws, ch. 260, § 2. As summarized by our supreme court,

> [Section 13-753[5]] involves several steps in which experts examine a capital defendant "using current community, nationally and culturally accepted physical, developmental, psychological and intelligence testing procedures, for the purpose of determining whether the defendant has mental retardation." The experts submit reports and the trial court holds a hearing at which the defendant bears the burden of proving mental retardation by clear and convincing evidence. A finding by the trial court of mental retardation prohibits the imposition of the death penalty.

*Grell I*, 205 Ariz. 57, ¶ 39, 66 P.3d at 1240, *quoting* § 13-753(E) (citations omitted). The court noted Arizona's statute "appears to comport substantively and procedurally with the principles set forth in *Atkins*," *id.* n.4, and remanded the case for a determination of whether Grell, who had been sentenced before the statute took effect, was "mentally retarded and therefore ineligible to receive the death penalty" pursuant to constitutional principles announced by the Supreme Court in *Atkins*, *id.* ¶¶ 41-42.

¶10 In an appeal after remand, our supreme court affirmed the trial court's finding that Grell had failed to establish mental retardation by clear and convincing evidence. *Grell II*, 212 Ariz. 516, ¶ 63, 135 P.3d at 709. The court rejected Grell's arguments that § 13-753 is unconstitutional because it places the burden of proving mental retardation on the defendant; because it requires the defendant to prove mental retardation by clear and convincing evidence; or because it permits capital punishment in

---

[5]Section 13-703.02, A.R.S., cited in *Grell I*, has been renumbered as § 13-753. 2008 Ariz. Sess. Laws, ch. 301, § 26. We refer here to the current statute.

the absence of a jury finding, beyond a reasonable doubt, that the defendant is not mentally retarded. *Id.* ¶¶ 29, 41, 49.

¶11        Relevant to some of the issues Williams raises, Grell also had argued the trial court erred in finding the evidence insufficient to establish he had a significant impairment in adaptive behavior and asserted he had "clearly shown that [he] has deficits in two of the eleven areas listed in the [APA's] DSM-IV and therefore has mental retardation." *Id.* ¶ 62. Our supreme court explained,

> The DSM-IV definition of mental retardation, . . . while similar in overall meaning, is not the same as the statutory definition. The statute requires an overall assessment of the defendant's ability to meet society's expectations of him. It does not require a finding of mental retardation based solely on proof of specific deficits or deficits in only two areas.

*Id.* With this standard in mind, the court found the evidence was sufficient to "support a finding that Grell was able to function at a level higher than that of 'significant impairment'" and concluded the trial court did not clearly err in finding Grell had "failed to prove mental retardation by clear and convincing evidence." *Id.* ¶ 63. The court also found Grell was entitled to be resentenced by a jury, pursuant to the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 589 (2002), and remanded the case for that proceeding. *Id.* ¶¶ 64-67.

¶12        On remand, a jury imposed the death penalty, and Grell's case was returned to our supreme court on automatic appeal, pursuant to A.R.S. § 13-755(A). *State v. Grell* (*Grell III*), 231 Ariz. 153, ¶ 1, 291 P.3d 350, 351 (2013). The court "independently

8

review[ed] the propriety of the death sentence,"[6] considered whether Grell had established mental retardation in the penalty phase of his resentencing hearing, and concluded, "Grell is not subject to the death penalty by reason of mental retardation." *Id.* ¶¶ 3-4, 10.

¶13 The court emphasized in *Grell III* that its "inquiry differ[ed]" from the questions raised in *Grell II*, in which it had deferred to the trial court's determination "that Grell had not proved by clear and convincing evidence that he had significant deficits in adaptive behavior" because "'[r]easonable minds [could] differ as to how to interpret the evidence presented.'" *Id.* ¶¶ 9-10, *quoting Grell II*, 212 Ariz. 516, ¶ 63, 135 P.3d at 709 (alteration in *Grell III*). In contrast to its inquiry in *Grell II*, the court explained it was required in *Grell III* to "*independently* review the evidence presented in the 2009 resentencing," without deference to the jury's findings or decisions, "to

---

[6]The court noted Grell's death sentence was subject to independent review because he had committed the murder before August 1, 2002. *Grell III*, 231 Ariz. 153, ¶ 3, 291 P.3d at 351; *see also* § 13-755(A). For capital murders committed on or after August 1, 2002, our supreme court does not conduct an independent review of the propriety of a death sentence, but "determine[s] whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death." *See* A.R.S. § 13-756(A); *State v. Cota*, 229 Ariz. 136, ¶¶ 90-92, 272 P.3d 1027, 1044 (2012) (section 13-756 sets appellate standard of review; review of death sentence for abuse of discretion under § 13-756 constitutionally permissible; Constitution does not require independent review of whether "appellate court itself would have imposed a death sentence"). It appears Williams's claim of mental retardation would be subject to the court's automatic review of the propriety of any death sentence that may be imposed in the future, although the evidence may be reviewed for an abuse of discretion, rather than independently. *Cf.* A.R.S. § 13-752 ("The trier of fact shall make all factual determinations required by this section or the Constitution of the United States or this state to impose a death sentence. If the defendant bears the burden of proof, the issue shall be determined in the penalty phase."); § 13-756(A).

determine whether Grell proved mental retardation by a preponderance of the evidence." *Id.* ¶ 10. The court further noted its determination in *Grell III* had been based on a preponderance of the evidence—a "less demanding" standard of proof "than the clear and convincing evidence standard" employed in *Grell II* and "required for a pre-trial finding," pursuant to § 13-753(G), "that mental retardation barred imposition of the death penalty." *Id.* Finally, the court observed that Grell had presented "substantially more—and more convincing—evidence of adaptive skill deficits" at his 2009 resentencing hearing than he had presented at the 2005 hearing held on the sole issue of whether he was mentally retarded and therefore ineligible for a death sentence. *Id.* ¶ 11.

¶14        Like the court in *Grell II*, our review is limited to whether the respondent judge "clearly err[ed]" in concluding Williams failed to prove an intellectual disability by clear and convincing evidence, and we must defer to the respondent's determination if "reasonably supported by evidence." *Grell II*, 212 Ariz. 516, ¶ 63, 135 P.3d at 709; *see also Book Cellar, Inc. v. City of Phx.*, 139 Ariz. 332, 335, 678 P.2d 517, 520 (App. 1983) (in review by special action, court does not weigh evidence but determines whether sufficient evidence supported decision and whether trial court properly exercised discretion).

¶15        Here, three experts testified at the *Atkins* evidentiary hearing: Neuropsychologist James Sullivan testified for the defense on the issue of Williams's cognitive function, and, on the issue of Williams's adaptive behavior, psychologist Ricardo Weinstein testified for the defense and psychologist Sergio Martinez testified for the state. Each of these experts also provided a written report summarizing his evaluation

and conclusions. Sullivan concluded "beyond a reasonable psychological certainty" that Williams presently "has pronounced and authentic neuropsychological and psychiatric impairment." He offered no similarly confident conclusion regarding the etiology of these impairments or whether Williams met other clinical or statutory criteria for an intellectual disability, but found it "quite likely" that Williams's "documented cerebral dysfunction . . . is a direct result of prenatal insult," such as his mother's substance abuse during pregnancy, "as well as exposure to severe childhood psychological trauma in the form of physical and sexual abuse." Weinstein concluded Williams "fulfills the definitions of Intellectual Disabilities (Mental Retardation) contained in . . . § 13-753(K) as well as the ones contained in the DSM-IV . . . and [promulgated by] the AAIDD." Martinez concluded Williams "does not meet the criteria" in § 13-753(K)(3), finding "no evidence" to demonstrate that "he experienced significantly subaverage general intellectual functioning along with significant impairment in adaptive functioning" before the age of eighteen.

¶16 In the order under review, the respondent judge correctly identified the "determinative issues" as "whether there is sufficient evidence that [Williams's] intellectual functioning was significantly sub-average and whether his 'adaptive behavior' was significantly impaired, and if so, whether the evidence is clear and convincing that he suffered from [these conditions] before the age of [eighteen]."

¶17 With respect to intellectual functioning, the respondent judge found "[Williams's] current intelligence quotient is below [seventy], 'significantly sub-average.' However, his IQ likely was higher [twenty] years ago, at age [eighteen]. The

11

current level 'absolutely,' as Dr. Sullivan put it, is lower because of [Williams's] drug and alcohol abuse and worsening mental illness." Similarly, the respondent found, "[Williams] does present now with 'significantly impaired function' as shown by Dr. Sullivan's recent neuropsychological testing," but "the evidence does not support a finding that, as the governing statute mandates, there is 'clear and convincing evidence' that [Williams's] adaptive behavior was affected" by this intellectual deficiency, either before or after the age of eighteen.

¶18 To establish an intellectual disability under § 13-753, Williams was required to show by clear and convincing evidence that he suffered "the onset of an IQ [of seventy or] below . . . before the age of [eighteen]." *Moormann v. Schriro*, 672 F.3d 644, 648-49 (9th Cir. 2012) (Arizona Supreme Court's denial of stay of execution, where defendant's offer of proof pertained to declining IQ as adult post-conviction, not contrary to or unreasonable application of clearly established federal law); *see also State v. Arellano*, 213 Ariz. 474, ¶ 21, 143 P.3d 1015, 1021 (2006) ("The provision [in § 13-753] requiring that symptoms of mental retardation occur before age eighteen applies to both elements of mental retardation: significantly subaverage intelligence and significantly impaired adaptive behavior."). Sullivan reported Williams's full scale IQ currently is seventy, "consistent with borderline overall function" and on the cusp of Arizona's definition of the "[s]ignificantly subaverage general intellectual functioning" required to establish an intellectual disability pursuant to § 13-753(K)(3) and (5).

¶19 Although Sullivan stated Williams's reported substance abuse and mental illness as an adult, considered either alone or in combination, could not account for the

12

full extent of impairments Sullivan found during neuropsychological tests, he also testified there was "no question that these two things combined together [have] lessen[ed] his over all [sic] level of function" over time, to an extent Sullivan could not quantify.[7] Similarly, Sullivan reported Williams's performance on recent achievement tests is "quite likely . . . lower than [his] level of function when he was able to graduate from [high school] and attend college," with "[t]he source of this decline . . . most probably a combination of ongoing substance abuse and worsening mental illness." And, when asked directly about the effect of Williams's "extensive drug and alcohol abuse" on his current test scores, Sullivan testified Williams's "testing scores [absolutely would] have been better than they are right now" had he "never pick[ed] up a drug or a drink." Thus, Sullivan, an expert in assessing cognitive functioning, disagreed with Weinstein's opinion that Williams's use of drugs and alcohol as an adult "would not have significantly reduced his overall cognitive abilities" as they existed before the age of eighteen.

¶20    As the respondent judge observed, Sullivan's opinion that Williams's test scores would have been higher, by some incalculable amount, when he graduated from high school supports a conclusion that Williams's full scale IQ was higher than seventy at the age of eighteen, and only declined to its current level during Williams's adult years,

---

[7]When asked if he could quantify the relative effects of substance abuse and mental illness in accounting for Williams's current level of intellectual functioning, Sullivan said he could not, because there were "too many [unknown] variables." He added that "the history and the issues of the sexual abuse, the physical abuse, [and] the potential in utero insults from the mother" would likely "carry more of the variance" with respect to the impairments, due to the greater "plasticity" of the brain during childhood.

due to his "drug and alcohol abuse and worsening mental illness." Based on this evidence alone, the respondent reasonably could have found the evidence less than clear and convincing—and thus insufficient—to establish that Williams suffered from significantly subaverage general intellectual functioning with an onset that occurred "before [he] reached the age of eighteen." § 13-753(K)(3).

¶21 The respondent judge's determination finds further support in Martinez's opinions that Williams "was able to perform at higher levels of adaptive and intellectual functioning in adolescence and adulthood" when he abstained from alcohol and drugs and that "no evidence" demonstrates Williams had the intellectual and adaptive behavior deficits required by § 13-753 "prior to the age of eighteen." The absence of clear and convincing evidence establishing that Williams had an IQ of seventy or below before the age of eighteen provided a sufficient basis to deny Williams's pre-trial claim under § 13-753(G). *See Moormann*, 672 F.3d at 648-49; *Arellano*, 213 Ariz. 474, ¶ 21, 143 P.3d at 1020.

¶22 Williams challenges the respondent judge's rejection of the "retrospective analysis" performed by Weinstein, whose opinion is based in part on interviews he conducted with seventeen people who knew Williams before and after the age of eighteen, including family and extended family members, former classmates and friends, work supervisors, and a high school administrator. In addition to reporting their memories of Williams at different ages, Williams's mother told Weinstein she had used alcohol and drugs and had tripped on some stairs while pregnant with Williams, and other

14

interviewees reported Williams had landed on a hard floor when dropped as an infant and had been physically and sexually abused as a child.

¶23      The respondent judge found, "Dr. Weinstein's . . . methodology . . . is not persuasive . . . . In particular, Dr. Weinstein's 'history' is suspect. It is largely supported by biased reports. No independent or verifiable evidence supports it." According to Williams, "[T]o find that such an analysis cannot meet a clear and convincing standard is tantamount to denying mentally retarded individuals who are substantially older than [eighteen]" the protection afforded by *Atkins*, "because [their intellectual disability] would be impossible to prove."[8]

¶24      But a trial court is required to evaluate the weight and credibility of the evidence produced to support a finding of mental retardation. *Grell II*, 212 Ariz. 516, ¶ 58, 135 P.3d at 708. And, on appeal, a finding of fact cannot be clearly erroneous if substantial evidence supports it, even though substantial conflicting evidence also exists. *State v. Berryman*, 178 Ariz. 617, 623, 875 P.2d 850, 856 (App. 1994), *citing Moore v. Title Ins. Co. of Minn.*, 148 Ariz. 408, 413, 714 P.2d 1303, 1308 (App. 1985). "We do not reweigh the evidence to decide if we would reach the same conclusions as the trier of fact." *State v. Carey*, 186 Ariz. 121, 124, 920 P.2d 1, 4 (App. 1995).

¶25      Williams's argument essentially begs the question our supreme court answered in *Grell II*, when it concluded that "requiring the defendant to prove mental retardation by clear and convincing evidence in the initial retardation hearing does not violate constitutional standards." *Grell II*, 212 Ariz. 516, ¶ 41, 135 P.3d at 705. In a case

---

[8]Williams presently is thirty-nine years old.

such as this, where a defendant's intellectual and adaptive functioning were not tested when he was a child, or where such test results are unavailable, a trial court must consider whether inferences from other evidence establish that the onset of concurrent deficits in these areas, sufficient to meet statutory requirements, occurred before the defendant reached the age of eighteen. *See Arellano*, 213 Ariz. 474, ¶ 21, 143 P.3d at 1020-21 (noting "pre-age-eighteen IQ test results are not always available"). That appears to be what the respondent judge did in this case. Nothing in the record suggests the respondent categorically excluded evidence that might be offered in support of an older defendant's *Atkins* claim; to the contrary, in his order, the respondent painstakingly summarized the evidence presented and set forth the reasons he found certain evidence more or less persuasive.

¶26 As the respondent judge pointed out, both Weinstein and Sullivan identified problems with the reliability of retrospective analyses. Moreover, Sullivan explained that he regarded in utero insult and childhood abuse as "risk factors," rather than "causative factors" responsible for Williams's present condition, because he had no documentation to corroborate reports that Williams's mother had used drugs and alcohol while pregnant or that Williams had been abused as a child. Sullivan testified, "[I]f we . . . had birth records that show he was born a crack baby and we had his mother laying it out on the line being honest about what actually happened then[, when Williams was born,] . . . they would become causative factors, right now I just don't know." In light of Sullivan's doubts about the veracity of these reports, we cannot say the respondent clearly erred in finding the history of sexual and physical abuse and in utero insults, obtained from

16

Williams and his family, less than clear and convincing evidence that Williams suffered the impairments required by § 13-753(K) before the age of eighteen.

¶27 Williams nonetheless challenges—as "illogical and contrary to the evidence"—the respondent judge's conclusion that Williams failed to show the onset of the required impairments occurred before the age of eighteen, and he asserts "the only plausible explanation for [Williams's] condition is pre-natal insult combined with childhood physical and sexual abuse." Specifically, Williams cites the testimony of Sullivan and Weinstein to support the proposition that "unless there is a credible explanation for how a person could become functionally retarded after age [eighteen], . . . it is assumed that the condition occurred prior to" that age.

¶28 Williams is referring to Sullivan's testimony that "neuropsychological impairments are presumed to be neurodevelopmental in nature" and occurring "early on in the life span until proven otherwise" by an adequate medical explanation for brain damage occurring as an adult, such as a traumatic brain injury, stroke, or certain kinds of substance abuse. But Sullivan also testified Williams's substance abuse was a "contributing factor" to his intellectual impairment and accounted for some portion of the deficits currently reflected in his full-scale IQ test score of seventy; thus, as already discussed, according to Sullivan, Williams's IQ test scores would have been higher than seventy in late adolescence and early adulthood. Similarly, Martinez concluded Williams's current full-scale IQ score of seventy did not evince an onset of that condition prior to the age of eighteen, particularly where there was "no indication" Williams routinely had "performed in the significantly impaired range of intellectual functioning"

17

while in public school. These expert opinions constitute reasonable evidence that supports the respondent judge's findings, even if other, contradictory evidence may be found in the record. *See State v. McCurdy*, 216 Ariz. 567, 573, 169 P.3d 931, 937 (App. 2007) ("substantial evidence" supports finding "[i]f reasonable persons could differ as to whether the evidence establishes a fact in issue"); *State v. Mercer*, 13 Ariz. App. 1, 2, 473 P.2d 803, 804 (1970) (conflicts in testimony do not render evidence insufficient); *see also State v. Cañez*, 202 Ariz. 133, ¶ 114, 42 P.3d 564, 594 (2002) (according "great deference" to trial court's resolution of conflicting psychological evidence offered by experts).

¶29        Quoting *Nicholson v. Branker*, 739 F. Supp. 2d 839, 857 (E.D.N.C. 2010), Williams maintains there is "no requirement that [a defendant] show he had scored [seventy] or below on a[n IQ] test given prior to the age of [eighteen]" to establish his mental deficiency "manifested before [eighteen] years of age." We do not suggest otherwise. *See Arellano*, 213 Ariz. 474, ¶ 21, 143 P.3d at 1020-21. We agree with those authorities concluding that, when no childhood IQ tests were performed, subaverage intellectual functioning before the age of eighteen properly may be inferred from other evidence of intellectual functioning, such as school performance. *See, e.g.*, *Rivera v. Quarterman*, 505 F.3d 349, 363 (5th Cir. 2007). But the respondent judge was not required to infer that Williams had suffered, as a child, from the level of intellectual impairment required to establish an intellectual disability under Arizona law, particularly in light of Sullivan's and Martinez's opinions to the contrary. *See Pizzuto v. State*, 202 P.3d 642, 651 (Idaho 2008) (trial court considering *Atkins* claim not required to infer

18

defendant's IQ "had not decreased during the eleven-year period from his eighteenth birthday to the date of his IQ test[,] . . . especially in light of the opinions of [his own] experts that his long history of drug abuse and his epilepsy would have negatively impacted his mental functioning"); *Commonwealth v. Vandivner*, 962 A.2d 1170, 1186-87 (Pa. 2009) (insufficient evidence of onset before age eighteen where expert testified head injuries and other conditions occurring in adulthood "led to a decline in cognitive capacity"; refusing to extend categorical prohibition against execution of mentally retarded to other capital defendants with mental deficiencies absent evidence of "national consensus" found in *Atkins*).

¶30         Because we conclude the respondent judge did not err in finding Williams failed to establish by clear and convincing evidence he had significantly subaverage general intellectual functioning before the age of eighteen, we need not review his ruling that "[i]t certainly is not 'clear'" that Williams suffered from significant impairments in adaptive behavior, either before or after the age of eighteen. *See State v. Snelling*, 225 Ariz. 182, n.8, 236 P.3d 409, 417 n.8 (2010) (when one issue dispositive, court need not reach other issues). However, we will address briefly the issues Williams raises, because many of his arguments are related to this determination.

¶31         In finding the evidence of adaptive impairments less than clear and convincing, the respondent judge noted that Williams "went to school, traveled by bus, stayed out of trouble, graduated from school on time, went to college, and was employed, at one job for several years." The respondent appears to have relied on Martinez's opinion that any difficulties Williams's experienced in adaptive behavior did not rise to

19

the level of the "significant impairment" required to support a finding of intellectual disability under Arizona law. *See* § 13-753(K)(3).

¶32      Williams first seems to suggest the respondent judge abused his discretion in relying on Martinez's report and testimony; he contends Martinez conducted only a "cursory assessment" of Williams's intellectual and adaptive functioning and is only "marginally qualified" when compared to Sullivan and Weinstein. But Williams does not contend Martinez was unqualified or his testimony was incompetent under the requirements of § 13-753. Although Williams asserts Martinez had "no foundation" for his opinion that, had Williams suffered from an intellectual disability, his deficits in intellectual functioning and adaptive behavior would have been identified while he was in public school, Martinez testified he had once been employed as a school psychologist. Williams is correct that Martinez professed no knowledge of the policies employed by the particular public schools Williams had attended, but although this limitation might affect the weight of the evidence, it does not render it inadmissible. *See State v. Davolt*, 207 Ariz. 191, ¶ 70, 84 P.3d 456, 475 (2004) (degree of expert's qualifications goes to weight of testimony, not its admissibility).

¶33      Williams had a full opportunity to examine Martinez on his knowledge and experience, and we see no clear error in the respondent judge's consideration of this testimony. *Carey*, 186 Ariz. at 124, 920 P.2d at 4 (reviewing court does not reweigh expert testimony); *State v. Wassenaar*, 215 Ariz. 565, ¶ 2, 161 P.3d 608, 612 (App. 2007) (reviewing court resolves conflicts in evidence in favor of sustaining judgment).

¶34 Citing AAIDD assessment guidelines, Williams also asserts Martinez and the respondent judge "relied upon [Williams's] adaptive strengths, as opposed to [his] deficits, which is not a proper consideration in an adaptive behavior analysis," because "mentally retarded people are capable of many adaptive functions." But in *Grell II*, our supreme court emphasized that Arizona's statutory definition, "while similar in overall meaning, is not the same as" clinical definitions, and "requires an overall assessment of the defendant's ability to meet society's expectations of him," not "proof of specific deficits." *Grell II*, 212 Ariz. 516, ¶ 62, 135 P.3d at 709. As in this case, the decision under review in *Grell II* "was based largely on expert testimony," and "the trial court determined that the State's expert was more credible." *Id.* ¶ 58. Deferring to the court's broad discretion in determining the weight and credibility afforded expert testimony, our supreme court affirmed the court's ruling. *Id.* ¶ 63.

¶35 The respondent judge's reasoning here appears consistent with the ruling affirmed in *Grell II*, and we decline to adopt a standard for analysis inconsistent with that decision or the deference it requires. *See id.* ¶¶ 61-62 (state countered evidence of Grell's poor academic and social behavior "with three main themes: no doctor before defense expert . . . had ever diagnosed Grell as having mental retardation; behaving badly does not necessarily indicate adaptive deficits; and Grell can behave himself when he wants to do so"); *Grand v. Nacchio*, 214 Ariz. 9, ¶ 19, 147 P.3d 763, 771 (App. 2006) (declining to apply doctrines that might "effectively nullify" test adopted by supreme court); *see also Hooks v. Workman*, 689 F.3d 1148, 1172 (10th Cir. 2012) (AAIDD's "clinical standard" of considering deficits rather than strengths "not a constitutional command"

21

nor required by *Atkins*); *Ortiz v. United States*, 664 F.3d 1151, 1168-69 (8th Cir. 2011) (*Atkins* did not "delegate[] to the scientific community the finding of whether an individual is mentally retarded"; rejecting standard limiting assessment to adaptive deficits because "[c]onsideration of . . . strengths" may "provide context and definition for consideration of reported deficits"); *Clark v. Quarterman*, 457 F.3d 441, 445 (5th Cir. 2006) (*Atkins* "did not dictate that the approach and the analysis of the State inquiry must track the approach of the AAMR or the APA exactly").

¶36 In other arguments that the respondent judge erred in finding insufficient evidence of adaptive behavior impairment, Williams challenges the manner in which the respondent weighed the evidence and the inferences he drew from undisputed facts. But in our review of the respondent's ruling pursuant to § 13-753, we defer to his resolution of conflicting evidence, and we do not substitute our independent judgment for his. *Grell III*, 231 Ariz. 153, ¶¶ 9-10, 291 P.3d at 353; *Grell II*, 212 Ariz. 516, ¶ 63, 135 P.3d at 709; *Gen. Elec. Capital Corp. v. Osterkamp*, 172 Ariz. 185, 188, 836 P.2d 398, 401 (App. 1992) (reviewing court will not "second-guess or substitute [its] judgment" for trial court's resolution of disputed fact).

**The Dissent**

¶37 As an initial matter, it appears our dissenting colleague has reached an issue that Williams did not raise below, a practice we ordinarily avoid. *See, e.g.*, *Cornerstone Hosp. of Se. Ariz., L.L.C. v. Marner*, 231 Ariz. 67, n.4, 290 P.3d 460, 472 n.4 (App. 2012). The limited record before us contains no indication that Williams had argued the definition of intellectual disability in § 13-753 is unconstitutional or that the respondent

22

judge considered such a claim. Although the respondent referred informally to "an *Atkins* hearing" in his order, he clearly conducted the hearing and entered his ruling in accordance with § 13-753, applying that statute's definitions in the proceeding it mandated. *See* § 13-753(G), (K). The dissent maintains the respondent erred precisely because he ruled in "conformity with the statutory standard," when he instead should have rejected the statutory definition in favor of a "clinical definition" promulgated by the APA or AAIDD. *See infra* ¶¶ 53, 61-62.

¶**38** First, as addressed above, we conclude our supreme court considered and rejected a nearly identical argument in *Grell II*, 212 Ariz. 516, ¶¶ 60-63, 135 P.3d at 709. According to the dissent, the court in *Grell II* did not expressly consider whether the definition of intellectual disability in § 13-753 is consistent with the holding in *Atkins*, and this remains an open issue. *See infra* ¶¶ 48, 78-79. But the fact remains that in *Grell II*, after resolving other "issues of constitutional law and statutory construction" and recognizing state procedures to identify mentally retarded capital defendants "must comport with the Constitution," 212 Ariz. 516, ¶¶ 22, 24, 135 P.3d at 701, 702, the court rejected the defendant's argument that he had established mental retardation pursuant to the DSM-IV definition, explaining that, "while similar in overall meaning, [that standard] is not the same as the statutory definition." *Id.* ¶ 62. The court then relied on this distinction in finding, based on an "overall assessment" of adaptive functioning permitted by Arizona's statute, substantial evidence supported the trial court's ruling that Grell had failed to sustain his burden of proving mental retardation. *Id.* ¶¶ 62-63. When later conducting its own independent review of Grell's death sentence, the court again relied

on the statutory definition to guide its analysis, albeit with a different result. *Grell III*, 231 Ariz. 153, ¶¶ 5, 7, 15, 34, 291 P.3d at 351-52, 353, 356-57; *see also State v. Boyston*, 231 Ariz. 539, ¶¶ 34-36, 298 P.3d 887, __ (2013) ("[a]lthough the DSM–IV defines impairments in adaptive functioning based on deficits in two areas," that definition "is not the same as the statutory definition," which, "by contrast, 'requires an overall assessment of the defendant's ability to meet society's expectations of him'"), *quoting Grell II*, 212 Ariz. 518, ¶ 62, 135 P.3d at 709.

¶39        Thus, Arizona's supreme court appears to have interpreted *Atkins* as "leaving the definition of mental retardation to the states," such that the prohibition against executing the mentally retarded "depends on the state's definition of mental retardation." *State v. Roque*, 213 Ariz. 193, ¶ 149, 141 P.3d 368, 402 (2006); *Grell II*, 212 Ariz. 516, ¶ 37, 135 P.3d at 705 (knowing that "states had already begun to develop their own procedures, and had drawn in different places the line for establishing the mental retardation that would bar execution," Supreme Court "left states . . . free to craft their laws for determining which defendants meet the [national] consensus standard").

¶40        Second, although the dissent asserts "the Court [in *Atkins*] defined mental retardation by the diagnostic criteria universally accepted by clinicians," *infra* ¶ 51, this position is contrary to pronouncements from the United States Supreme Court and every other state court that has addressed the issue. The Supreme Court itself has stated that *Atkins* "did not provide definitive procedural *or substantive guides* for determining when a person who claims mental retardation 'will be so impaired as to fall [within Atkins' compass]'" but left enforcement of the constitutional restriction to the states. *Bobby v.*

24

*Bies*, 556 U.S. 825, 831 (2009), *quoting Atkins*, 536 U.S. at 317 (emphasis added); *Moormann v. Schriro*, 672 F.3d 644, 648 (9th Cir. 2012) (*Atkins* "did not define mental retardation as a matter of federal law"); *see also* Julie C. Duvall & Richard J. Morris, *Assessing Mental Retardation in Death Penalty Cases: Critical Issues for Psychology and Psychological Practice*, 37 Prof. Psychol.: Res. & Prac. 658, 658 (2006) (*Atkins* "did not define mental retardation" or identify "any terms or procedures that could guide legislatures or judges in determining" those defendants "'so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus'"), *quoting Atkins*, 536 U.S. at 317. Additionally, every other state court that has addressed the issue has determined or implied that *Atkins* allows the states to define mental retardation without strict adherence to the clinical standards. Of the thirty-three states that still permit use of the death penalty, courts in twenty-three have stated or implied that *Atkins* did not define mental retardation, but instead left that task to individual states. *See infra* Appendix 1. The other ten states have not spoken on the issue. Many state statutes also define mental retardation or intellectual disability in ways that vary from the AAMR, AAIDD, and DSM-IV definitions. *See infra* Appendix 2. As noted above, several courts have expressly rejected the proposition that states must strictly adhere to clinical definitions or assessment standards. *See supra* ¶ 35.

¶41 Third, Arizona's statute was among those enacted before *Atkins* was decided and was found to be evidence of the "national consensus" that mentally retarded offenders should not be executed. *See Atkins*, 536 U.S. at 314-15. The dissent acknowledges the Supreme Court's statement that existing "statutory definitions of

25

mental retardation are not identical, but generally conform to the clinical definitions [of the AAMR and APA]," *Atkins*, 536 U.S. at 317 n.22, and maintains this observation served only "to reinforce the conclusion that a true national consensus had coalesced around" those clinical definitions. *See infra* ¶ 74. But the placement of this footnote suggests otherwise. It appears at the end of a paragraph in which the Court addressed "disagreement . . . in determining which offenders are in fact retarded" and immediately after the Court's statement that it would leave to the states "the task of developing appropriate ways to enforce the constitutional restriction." *Atkins*, 536 U.S. at 317. Thus, in context, the Supreme Court signaled that those states that had already enacted statutes prohibiting execution of the mentally retarded, including Arizona, had met this task by adopting definitions of mental retardation that "generally conform" to clinical standards. *Id.* at 317 & n.22.

¶42        Fourth, we agree with the state that, as a policy matter, requiring strict adherence to clinical standards could create some instability in this area of the law. As we have seen, clinical standards may change over time, *see supra* note 4; it seems unlikely the Supreme Court would have delegated the interpretation of the Eighth Amendment to clinicians. Rather, deference to state legislation that generally conforms to clinical standards is consistent with the Court's recognition that "'[c]ourts are not representative bodies'" and do not act "as legislators," and that, "under our federal system," the deference owed "state legislatures . . . is enhanced where the specification of punishments is concerned, for 'these are peculiarly questions of legislative policy.'" *Gregg v. Georgia*, 428 U.S. 153, 174-76 (1976), *quoting Dennis v. United States*, 341

26

U.S. 494, 525 (1951) (Frankfurter, J., concurring) (alteration added) *and Gore v. United States*, 357 U.S. 386, 393 (1958); *see also Panetti v. Quarterman*, 551 U.S. 930, 957 (2007) (Supreme Court has yet to "set forth a precise standard for competency" to be executed under *Ford v. Wainwright*); *Addington v. Texas*, 441 U.S. 418, 431 (1979) ("The essence of federalism is that states must be free to develop a variety of solutions to problems and not be forced into a common, uniform mold"; noting substantive and procedural standards for civil commitment "may vary from state to state, . . . so long as they meet the constitutional minimum").

¶43 Finally, we note that our dissenting colleague focuses on the respondent judge's analysis of Williams's adaptive functioning and does not address his determination that Williams also failed to present clear and convincing evidence of a substantial impairment in intellectual functioning before the age of eighteen. Nor does the dissent address our conclusion that this finding was consistent with the evidence and independently sufficient to support the respondent's ruling. *See supra* ¶¶ 29-30; *see also Pruitt v. State*, 834 N.E.2d 90, 110 (Ind. 2005) (affirming death penalty, notwithstanding court's erroneous application of "too restrictive" standard to determine "substantial impairment of adaptive behavior," where record supported conclusion defendant failed to prove significantly subaverage intellectual functioning).

¶44 Accordingly, we conclude we are bound by our supreme court's pronouncements on this issue. The conclusion that states may enforce the prohibition in *Atkins* by implementing definitions that "generally conform" to clinical standards, 536 U.S. at 317 n.22, as Arizona's statutory definition does, *id.* at 314-15, 317 n.22, finds

27

further support in a later statement by the United States Supreme Court and in each state court case that has addressed the issue. Therefore, we cannot accept the dissent's position.

**¶45** We do not mean, as the dissent suggests, that the Supreme Court "intended to . . . preclude any future conceivable specific Eighth Amendment challenge" to statutes enacted before *Atkins*, *see infra* note 22; rather, the Court has stated clearly that as-applied challenges might be expected. *See Schriro v. Smith*, 546 U.S. 6, 7-8 (2005) (per curiam) (noting states' "measures for adjudicating claims of mental retardation" by capital defendants "might, in their application, be subject to constitutional challenge"; Ninth Circuit exceeded authority in "pre-emptively" ordering jury determination). But in light of our own supreme court's repeated statements that the statute is based on and generally conforms to clinical standards, as well as its rejection of the nearly identical position taken by the defendant in *Grell II*, we must leave any changes in that position to the supreme court. *See Roque*, 213 Ariz. 193, ¶ 149, 141 P.3d at 402 (Arizona statute based on "accepted medical definitions"); *Grell II*, 212 Ariz. 516, n.4, 135 P.3d at 699 n.4 (statutory definition "substantially consistent" with criteria cited in *Atkins*); *Grell I*, 205 Ariz. 57, n.4, 66 P.3d at 1241 n.4 (Arizona's statute "appears to comport substantively and procedurally with the principles set forth in *Atkins*"); *State v. Cañez*, 205 Ariz. 620, n.2, 74 P.3d 932, 938 n.2 (2003) (Arizona's statutory definition of mental retardation "very similar to that set forth in the DSM-IV"); *see also Ybarra v. State*, 247 P.3d 269, 274-75 (Nev. 2011) (adaptive functioning "'refers to how effectively individuals cope with common life demands and how well they meet the standards of

28

personal independence expected of someone in their particular age group, sociocultural background, and community setting'"), *quoting* DSM-IV 42; *State v. Long*, 207 Ariz. 140, ¶ 23, 83 P.3d 618, 623 (App. 2004) ("This court is bound by decisions of the Arizona Supreme Court and has no authority to overturn or refuse to follow its decisions.").

**Disposition**

¶46      As our supreme court has observed, "[r]easonable minds may differ as to how to interpret the evidence presented," but this does not provide a basis for relief from the respondent judge's ruling. *Grell II*, 212 Ariz. 516, ¶ 63, 135 P.3d at 709. On this record, we cannot say the respondent clearly erred in finding Williams failed to prove by clear and convincing evidence that he is mentally retarded or has an intellectual disability. *See* § 13-753(G). Accordingly, we deny relief.

/s/ *Joseph W. Howard*
JOSEPH W. HOWARD, Chief Judge

CONCURRING:

/s/ *J. William Brammer, Jr.*
J. WILLIAM BRAMMER, JR., Judge*

*A retired judge of the Arizona Court of Appeals authorized and assigned to sit as a judge on the Court of Appeals, Division Two, pursuant to Arizona Supreme Court Order filed December 12, 2012.

E C K E R S T R O M, Presiding Judge, dissenting.

¶47      In *Atkins v. Virginia*, the Court set forth a "substantive restriction" on the states, prohibiting the execution of the "mentally retarded." 536 U.S. at 321. In so doing, the Court made clear, both expressly and implicitly, that the category of those protected by its holding would be those classified as mentally retarded by clinical standards.[9] Although that holding also provides the respective states some substantive and procedural leeway in enforcing this constitutional restriction, no language in *Atkins* invites states to conjure their own definitions of the condition independent of clinical standards. Indeed, both the state and majority appear to concede that substantive statutory definitions of mental retardation must, at minimum, generally conform to the prevailing clinical definition of the condition to properly enforce the Eighth Amendment restriction on the execution of the mentally retarded.

¶48      Our own supreme court has observed that Arizona's statutory standard for evaluating impairment of adaptive functioning deviates from the clinical standard. *Grell II*, 212 Ariz. 516, ¶ 62, 135 P.3d at 709. It did so in the context of addressing an evidentiary claim raised and addressed exclusively under state law. *See id.* ¶¶ 58-63. Our highest court has neither considered, nor purported to address, the considerably more complex question of federal constitutional law raised by this case: whether, in spite of

---

[9]As the majority correctly points out, "intellectual disability" is now the preferred term for "mental retardation." For the sake of analytical clarity as to the specific issue presented here, I have elected to use the term employed in *Atkins*.

our statute's varying standard for evaluating adaptive functioning, that section of our statute substantially conforms to clinical diagnostic criteria and, therefore, Eighth Amendment standards.[10]

¶49 As shall be demonstrated below, Arizona's standard for evaluating impairment in adaptive functioning departs, in practical application, so markedly from the parallel clinical standard that it precludes the diagnosis of mental retardation for *most* of those who would be so defined by clinical standards. For that reason, I can only conclude that Arizona's standard for determining mental retardation fails to enforce the constitutional restriction set forth in *Atkins*, and therefore runs afoul of the Eighth Amendment to the United States Constitution.

**In prohibiting the execution of the mentally retarded, *Atkins* employed the clinical definition of that condition.**

¶50 In *Atkins*, the Court determined that "mentally retarded" offenders are "categorically excluded from execution" by the Eighth Amendment. 536 U.S. at 318; *accord id.* at 320-21. Because the exclusion is categorical, all those who fall within the Court's definition of mental retardation are exempted from capital punishment.

---

[10]Although I agree with the majority that the defendant failed to squarely raise this claim in his initial petition to this court, he did maintain generally that the trial court's consideration of the evidence violated the Eighth Amendment requirements set forth in *Atkins*. He thereafter more specifically complained that the respondent judge's evaluation of the evidence of adaptive functioning departed from clinical standards. Moreover, both parties were provided an opportunity to address the specific question we address here in supplemental briefing. At any rate, we do not ignore fundamental error when we find it in the record. *State v. Musgrove*, 223 Ariz. 164, ¶ 4, 221 P.3d 43, 45 (App. 2009). Because application of the correct definition of mental retardation goes to the core of this proceeding designed to enforce the Eighth Amendment restriction described in *Atkins*, the constitutional error here is fundamental and prejudicial.

¶51    There can be little doubt that the Court defined mental retardation by the diagnostic criteria universally accepted by clinicians.  In framing the issue presented by Atkins's case, the Court noted, and comprehensively recited, the definitions for mental retardation adopted, respectively, by the American Psychiatric Association (APA) and the American Association on Mental Retardation (AAMR) (now the American Association on Intellectual and Developmental Disabilities (AAIDD)).  *Id.* at 308 n.3.  Thereafter, the Court expressly anchored its reasoning in the clinical diagnostic criteria for that condition and clinical understandings of the capacities of persons so diagnosed.  *See id.* at 317-21. In that reasoning, the Court itemized the disabilities that the "clinical definitions of mental retardation require," it specified the effects of those deficits on criminal culpability, and it concluded that those deficiencies justify categorical exclusion of the mentally retarded from eligibility for the death penalty.  *Id.* at 318-21.

¶52    Thus, the United States Supreme Court has defined the class of mentally retarded persons ineligible for capital punishment with express reference to the deficiencies displayed by those diagnosed with the condition under clinical criteria. Those criteria, as specifically articulated by both the AAMR and the APA are: (1) significantly subaverage intellectual functioning; (2) significant limitations in adaptive functioning in two or more specific skill areas, namely "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety"; and (3) onset before age eighteen.  *Id.* at 308 n.3, *quoting* DSM-IV at 41.  As legal commentators have observed, "under *Atkins v. Virginia*, the Eighth Amendment protects individuals who meet the

32

AAIDD/AAMR criteria for mental retardation or the virtually identical criteria of the DSM-IV-TR." John H. Blume et al., *Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases*, 18 Cornell J.L. & Pub. Pol'y 689, 691 (2009).

**Arizona's statute deviates substantially from the clinical definition.**

**¶53**　　　　Here, the trial court did not apply the clinical definition of mental retardation in concluding that Williams was not intellectually disabled. Rather, the court applied Arizona's statutory definition of mental retardation set forth in § 13-753(K)(3). As the court acknowledged in its order, that definition deviates from the clinical standard in its criteria for determining whether an offender suffers from a significant impairment in adaptive functioning. In *Grell II*, the Arizona Supreme Court described this variance when addressing a state law challenge to a trial court's findings:

> The defense claims to have clearly shown . . . deficits in two of the eleven areas listed in the DSM-IV and therefore [the defendant] has mental retardation. The DSM-IV definition of mental retardation, however, while similar in overall meaning, is not the same as the statutory definition. The statute requires an overall assessment of the defendant's ability to meet society's expectations of him. It does not require a finding of mental retardation based solely on proof of specific deficits or deficits in only two areas.

212 Ariz. 516, ¶ 62, 135 P.3d at 709 (citation omitted).[11]

---

[11]As the majority indicates, the former A.R.S. § 13-703.02(K) discussed in *Grell II* was renumbered § 13-753(K), 2008 Ariz. Sess. Laws, ch. 301, § 26, and then amended to substitute the term "intellectual disability" for the term "mental retardation." 2011 Ariz. Sess. Laws, ch. 89, § 5. The statute has remained the same in material part.

¶54     Specifically, Arizona's statute requires a court to evaluate a defendant's "[a]daptive behavior" by a global assessment of "the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group." § 13-753(K)(1). By contrast, clinical definitions of mental retardation, as adopted by *Atkins*, require a clinician to consider seriatim how a defendant performs on each of an array of specific life skills. *See* DSM-IV at 41 (itemizing eleven specific skill areas); AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed. 1992) (itemizing ten). By those clinical standards, individuals are diagnosed as mentally retarded if they show significant limitations in a couple of those skill areas—even if they exhibit strengths in most others. *See* DSM-IV at 41 (definition for mental retardation met if person has limited functioning in two of eleven areas).[12]

¶55     For example, a defendant in Arizona must show he is significantly impaired overall in the adaptive category of "social responsibility" to be classified as mentally

---

[12]The AAIDD has since revised its diagnostic criteria for intellectual disability to require significant limitations in "adaptive behavior," which is defined as "the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives." AAIDD, *Intellectual Disability: Definition, Classification, and Systems of Supports* 43 (11th ed. 2010) (hereinafter AAIDD Manual). Behavior in each of those three categories is evaluated with reference to specific itemized life skills which incorporate the eleven skill areas listed in the DSM-IV criteria. *See* AAIDD Manual at 44. And deficits in all areas need not be established to classify an individual as mentally retarded. Indeed, an individual is deemed to have significant limitations in adaptive behavior if he or she performs on standardized measures "approximately two standard deviations below the mean" in *any* of the three types of adaptive behavior: conceptual, social, or practical. *Id.* at 43. Thus, the revised AAIDD definition is not a meaningful departure from either the DSM-IV criteria or the AAMR's prior definitional standard set forth in *Atkins*.

retarded under our statutory definition. *See* § 13-753(K)(1), (3) (requiring showing of significant impairment as to both "personal independence and social responsibility"). But no such showing is required under clinical definitions of mental retardation. Indeed, under the current AAIDD diagnostic standard, "social responsibility" is identified as but one of eight nonexclusive sub-factors to consider in evaluating "social skills," a category which, in turn, comprises a nonexclusive criterion for evaluating adaptive behavior. AAIDD, *Intellectual Disability: Definition, Classification, and Systems of Supports* 44 (11th ed. 2010) (hereinafter AAIDD Manual).

¶56 In essence, then, Arizona law precludes the diagnosis of mental retardation for any individual who fails to show significant impairment in both broad categories of "personal independence" and "social responsibility." And the determination required by statute involves an "overall assessment," *Grell II*, 212 Ariz. 516, ¶ 62, 135 P.3d at 709, that implicitly allows strengths in some adaptive skills to outweigh significant impairments in others.

¶57 Clinical definitions of mental retardation include no parallel requirement that a person with significantly subaverage intelligence also demonstrate significant deficits in both "personal independence" and "social responsibility." Indeed, a person need not exhibit overall impairment in either broad category. Rather, evidence of significant impairment in any two of many discrete skill areas is considered sufficient— together with a finding of significantly subaverage intelligence with the onset before age eighteen—to classify an individual as mentally retarded. And, by clinical standards,

individuals may receive such a classification regardless of how well they may perform in other skill areas pertinent to adaptive functioning.

¶58        Not surprisingly, the diagnostic approach adopted by clinicians conforms to clinical understandings of the behavior of most mentally retarded persons. As the definitional manual published by the AAIDD instructs: "Individuals with an [intellectual disability] *typically* demonstrate both strengths and limitations in adaptive behavior. Thus, in the process of diagnosing [intellectual disability], significant limitations in conceptual, social, or practical adaptive skills is not outweighed by the potential strengths in some adaptive skills." AAIDD Manual at 47 (emphasis added). According to the DSM-IV, mildly mentally retarded persons "*usually* achieve social and vocational skills adequate for minimum self-support" and, with appropriate supports, "*usually* live successfully in the community, either independently or in supervised settings." DSM-IV at 43 (emphases added).[13] Indeed, in this case, Williams presented a longitudinal study, through Dr. Weinstein's testimony, which found that thirty-six percent of those identified as mentally retarded in high school later "lived independently," and seventy-nine percent

---

[13]The DSM-IV also observes that people with "mild mental retardation," those with an IQ of fifty-five to seventy, make up about eighty-five percent of those classified as mentally retarded. DSM-IV at 42-43. Given that there is little practical difficulty in diagnosing those with an IQ below fifty-five, the correct identification of those with "mild mental retardation" is, for all practical purposes, the central task of an *Atkins* hearing.

either became employed, received technical training for employment, or attended higher education.[14]

¶59        In application, therefore, the difference between Arizona's statutory definition of mental retardation and the accepted clinical definition is neither semantic nor trivial. Rather, Arizona's statutory definition produces categorically different results in identifying the class of persons diagnosed as mentally retarded. While both definitions require evidence of significant impairment in adaptive behavior, Arizona requires that such impairment be considered globally and be manifested as to personal independence and social responsibility. But, by clinical standards, persons suffering from mild mental retardation typically can demonstrate either personal independence or social responsibility, and most possess notable strengths in some skill areas pertinent to those general statutory categories. Thus, Arizona's statutory requirements substantially narrow the class of persons who are defined as mentally retarded when compared with the class of those who would be clinically defined as such.

¶60        Although our legislature may well have drafted § 13-753(K) with the intention of correctly defining mental retardation in conformity with clinical standards,[15] and thereby complying with the holding of *Atkins*, the language of § 13-753(K) falls short of achieving that goal. In my view, Arizona's statutory definition cannot exclude the

---

[14]Dr. Weinstein so testified with reference to an exhibit that was not made part of the record. Accordingly, no citation to the study is available.

[15]The text of § 13-753(E), which requires expert witnesses to use accepted psychological testing procedures to evaluate a defendant for mental retardation, suggests such a legislative intent.

"typical" person suffering from mental retardation and yet comply with *Atkins*'s command that those suffering from mental retardation be categorically ineligible for execution. *See Pruitt v. State*, 834 N.E.2d 90, 110 (Ind. 2005) (permissible variation in defining adaptive functioning cannot constitutionally exclude "a majority of those who fit clinical definitions").

**The improper standard affected the outcome of the hearing.**

¶61        The record before us shows that the above flaws in Arizona's statute defining intellectual disability had a demonstrable effect on the trial court's ultimate conclusion that Williams does not suffer from mental retardation. In its exhaustive and conscientious minute entry, the trial court specifically noted the variation between the clinical standard for mental retardation and that set forth by § 13-753(K)(1), and the court adopted the statutory one.

¶62        In conformity with the statutory standard, the trial court evaluated Williams's adaptive behavior "overall" by considering whether he displayed a "wide variety of difficulties" in activities of daily living and whether he had difficulties living "independently in the world." In the court's view, these inquiries essentially captured the statutory definition for adaptive behavior. The court then expressly found Williams's display of one discrete adaptive skill—the ability to cook for a group of people—to be dispositive evidence that he could live independently. According to the court, "[a] finding that [Williams] was unable to live independently is not possible when he could cook for ten people for a year."

38

¶63        Given that the trial court understood Arizona's statutory definition of mental retardation to require a showing that the defendant could not live independently, this finding essentially resolved the question of the defendant's mental retardation under § 13-753(K)(1) and (3).[16]  But, as discussed above, no clinician would exclude the diagnosis of mental retardation based on a person's display of a single adaptive strength. Indeed, as the above clinical definitions make clear, most mentally retarded individuals possess some useful life and vocational skills, and most mildly mentally retarded persons can be taught such skills.[17]  As commentators have noted, when state standards allow fact-finders to place dispositive weight on individual adaptive strengths, those standards encourage diagnostic conclusions anchored in fundamental misunderstandings of the condition.  Blume, *supra*, at 707-08.  That appears to be what occurred in the case before us.[18]

---

[16]The trial court's remaining analysis of Williams's adaptive functioning repeatedly dismissed evidence of adaptive impairment with reference to competing evidence of adaptive strengths, an approach arguably compelled by Arizona's "overall assessment" standard.  *Grell II*, 212 Ariz. 516, ¶ 62, 135 P.3d at 709.

[17]Indeed, Williams's supervisor stated she had to direct him how to properly shop for those meals "until he learn[ed] how to do it."  Thus, Williams's adult ability to cook for a group was, in part, taught behavior.  *See* DSM-IV at 43 (defining those with "mild mental retardation" as "educable" and observing they usually achieve vocational skills).  Dr. Weinstein also directly testified that the ability to cook does not foreclose a finding of mental retardation, noting that his own son, who suffers from Down syndrome, is a very good cook.

[18]As our supreme court implied in *Grell III*, 231 Ariz. 153, ¶¶ 5, 10, 291 P.3d at 351-52, Arizona's procedural scheme necessarily requires a jury to independently determine, during the mitigation phase of a capital trial, whether a defendant is mentally retarded.  Yet jurors are even less equipped than experienced trial judges to avoid lay misunderstandings of mental retardation when faced with the provocative facts of a

¶64        The majority suggests that any such defect in the court's analysis would be harmless because the court also found that Williams had failed to present clear and convincing evidence of onset before age eighteen.  But here, where the trial court lacked evidence of an IQ test conducted on Williams before age eighteen, evidence of his adaptive functioning as a youth necessarily had heightened importance in the court's assessment of whether his mental retardation had a juvenile onset.  Any conclusion that Williams had demonstrated significant impairment in his adaptive functioning as a child would have countered the testimony credited by the trial court that Williams's intelligence level was higher as a juvenile than as an adult.

**_Atkins_ cannot be construed as inviting states, without limitation, to redefine the nature of the substantive constitutional restriction set forth in that case.**

¶65        The state suggests we may overlook any statutory deviation from prevailing clinical standards because the United States Supreme Court has, in _Atkins_, invited the states to develop their own substantive definitions for mental retardation.  It contends this invitation occurred in the following portion of that opinion:

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded.  In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation.  Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.  As was our approach in _Ford v. Wainwright_, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the

capital case.  Instructing those jurors with correct clinical standards thus becomes especially important in that context.

> constitutional restriction upon [their] execution of sentences."
> *Id.*, at 405, 416-417, 106 S.Ct. 2595.

*Atkins*, 536 U.S. at 317 (alterations in *Atkins*). But this paragraph, by its terms, only invites states to develop "ways to enforce" the constitutional restriction imposed in *Atkins*. No part of that language suggests the states are likewise entrusted with the power to redefine the substance of the constitutional restriction itself. As Chief Justice Rehnquist correctly observed in his dissent, the very point of the majority opinion was to limit Virginia's power, and that of its judges and sentencing juries, to determine who has presented "an insufficiently compelling reason to lessen their individual responsibility for the crime." *Id.* at 321-22 (Rehnquist, C.J., dissenting). That intention can likewise be found in the unambiguous words of the majority's ultimate holding that "the Constitution 'places a *substantive restriction on the State's power* to take the life' of a mentally retarded offender." *Id.* at 321, *quoting Ford*, 477 U.S. at 405 (emphasis added).

¶66 I would therefore decline the state's suggestion that we construe a portion of the Court's reasoning in a fashion so at odds with the clear intent expressed in its ultimate holding. Indeed, if courts accept the state's interpretation of the language, nothing would prevent individual states from requiring an IQ below fifty-five to demonstrate mental retardation or erecting a presumption that a defendant's ability to commit first-degree murder itself demonstrates sufficient intelligence to qualify for execution. Such potential legislative definitions of that condition would render the *Atkins*

41

holding irrelevant in practical effect and would eviscerate any meaningful "substantive restriction on the State's power" to take the life of a mentally retarded offender.[19] *Id.*

¶67 Rather, the above language relied upon by the state is correctly construed as reserving in the individual states the power to erect a procedural framework by which those suffering from mental retardation are identified. Notably, in the pivotal sentence of that paragraph, the Court invites states to "'develop[] appropriate ways to enforce'" constitutional restrictions "[a]s was our approach in *Ford v. Wainwright*." *Atkins*, 536 U.S. at 317, *quoting Ford*, 477 U.S. at 416-17. To avoid any confusion, the *Atkins* Court provided specific references to the portions of *Ford* that exemplified that approach. *See Atkins*, 536 U.S. at 317, 321. In those portions of *Ford*, the Court exclusively analyzes the *procedural mechanisms* by which Florida identified insane offenders exempt from execution. 477 U.S. at 405, 416-17. Indeed, the specific quotation that the *Atkins* majority lifts from *Ford*—the "develop[] . . . ways to enforce" language—was used in the *Ford* opinion itself to refer to the development of such "procedural safeguards." 477 U.S. at 416-17. Not surprisingly, therefore, our own supreme court has read that paragraph as providing procedural discretion to the states. *See Grell II*, 212 Ariz. 516, ¶¶ 24, 26, 41, 135 P.3d at 701-02, 705 (interpreting *Atkins* as providing states authority

---

[19]This concern is not far-fetched. As Justice Scalia notes in his dissent, Kansas's statutory definition of "mental retardation" does not include the mildly mentally retarded, *Atkins*, 536 U.S. at 343 n.2 (Scalia, J., dissenting), a group which, under clinical diagnostic criteria, makes up eighty-five percent of those classified as mentally retarded. DSM-IV at 43. And, as demonstrated above, Arizona's statutory definition of adaptive functioning has the practical effect of excluding most of those clinically classified as mildly mentally retarded.

"to develop appropriate procedures" to identify those who are mentally retarded, specifically the power to set forth the burden and standard of proof for mental retardation at pretrial hearing); *accord People v. Vasquez*, 84 P.3d 1019, 1022 (Colo. 2004).

¶68 The majority correctly observes that the supreme courts of both the United States and Arizona have also understood *Atkins* as permitting states to set forth substantive definitions of mental retardation that are not facsimiles of clinical standards. *See Bies*, 556 U.S. at 831; *Roque*, 213 Ariz. 193, ¶ 149, 141 P.3d at 402. But neither court has suggested that states are entitled to create wholly novel definitions of that condition, independent of the accepted clinical understandings of mental retardation and therefore unlimited by how *Atkins* employed that term. Rather, these cases are properly read as providing states enough definitional leeway to avoid hypertechnical challenges to statutes that properly enforce the substantive constitutional restriction set forth in *Atkins*, a restriction unquestionably anchored in clinical definitions of mental retardation. *See Bies*, 556 U.S. at 831 (acknowledging state procedural and substantive flexibility in "'developing appropriate ways to enforce the constitutional restriction'" by determining who is mentally retarded "*within Atkins' compass*"), *quoting Atkins*, 536 U.S. at 317 (emphasis added); *Atkins*, 536 U.S. at 317 & n.22 (allowing states variability to the extent necessary "'to enforce the constitutional restriction upon [their] execution of sentences'" and noting in footnote thereafter that non-identical statutes defining mental retardation "generally conform" to clinical definitions), *quoting Ford*, 477 U.S. at 416-17 (alteration in *Atkins*); *Roque*, 213 Ariz. 193, ¶ 149, 141 P.3d at 402 (articulating Arizona's authority to define mental retardation in context of challenge to Arizona's IQ threshold, but

43

emphasizing Arizona's statutory threshold arose from "accepted medical definitions" of mental retardation).

¶69    As Appendix 1 aptly demonstrates, those states that have addressed the question of variation have almost universally concluded that state definitions of mental retardation need not strictly adhere to clinical ones. *See* Appendix 1.[20] But none of those opinions suggest that states may deviate from clinical understandings of mental retardation without limitation.   To the contrary, those cases which have squarely contemplated the limits of state flexibility have concluded that conformity with clinical standards is still required.  *See Pruitt*, 834 N.E.2d at 108 (observing "[t]he Eighth Amendment must have the same content in all United States jurisdictions" and concluding state definitions of mental retardation "at odds with" clinical definitions "would not satisfy" *Atkins*); *Bowling v. Commonwealth*, 163 S.W.3d 361, 375 (Ky. 2005) (recognizing Supreme Court "left it to the states to formulate their own definitions, so long as they 'generally conform[ed] to the clinical definitions' established by the AAMR and the American Psychiatric Association as approved in *Atkins*"), *quoting Atkins*, 536 U.S. at 317 n.22 (alteration in *Bowling*); *Chase v. State*, 873 So. 2d 1013, ¶¶ 61-66, 68-72 (Miss. 2004) (noting ambiguity of *Atkins*'s "national consensus" language, but

---

[20]Several of the cases cited in the appendix concern only procedural questions such as the timing of an *Atkins* determination, the appropriate fact-finder, and the burden and standard of proof. *See, e.g.*, *Vasquez*, 84 P.3d at 1023; *State v. Turner*, 936 So. 2d 89, 94, 99 (La. 2006); *State v. Jimenez*, 908 A.2d 181, 188-89, 191-92 (N.J. 2006); *State v. Poindexter*, 608 S.E.2d 761, 767 (N.C. 2005); *State v. Laney*, 627 S.E.2d 726, 731-32 (S.C. 2006).

concluding constitution prohibits execution of all mentally retarded offenders, not subset thereof, and adopting clinical definitions as standard).

¶70        In *Pruitt*, the Indiana Supreme Court addressed a very similar problem to the one presented here.  There, the trial court assessed the defendant's adaptive functioning by adopting an analytical approach that would predictably characterize only those with an IQ below sixty as mentally retarded.  834 N.E.2d at 108-09.  Observing that such an approach would "eliminate approximately 75 to 89 percent of all individuals clinically diagnosed as mentally retarded under the standard medical definitions," the supreme court reversed the trial court's finding and concluded that "[a]lthough variation is permissible, it cannot go to the point of excluding a majority of those who fit clinical definitions."  *Id.* at 110.  As discussed above, the analytical approach to adaptive functioning compelled by Arizona's statutory standard likewise precludes the diagnosis of mental retardation for most of those who would be so defined by clinical standards.

¶71        In short, *Atkins* expressly reserves in the states the power to install varying procedural frameworks for engaging in the factual determination as to whether a defendant is clinically mentally retarded.  Presumably to preclude hypertechnical challenges to statutory definitions of clinical mental retardation, the language from *Atkins* has also been understood to allow some variation in statutory efforts to define the condition itself.  But, the Court authorized that flexibility exclusively to "'enforce the constitutional restriction'" it had imposed upon the states.  *Atkins*, 536 U.S. at 317, *quoting Ford*, 477 U.S. at 416.  That restriction, as *Atkins* makes unambiguously clear, is

45

that the mentally retarded, as that condition has been clinically understood, are not eligible for execution.

**In discussing the national consensus against the execution of the "mentally retarded," the Court did not intend to alter the clinical definition of that condition.**

¶72        In the same vein, the state contends the *Atkins* majority had no intention to "adopt any particular definition of 'mental retardation' as a constitutional metric." Instead, the state posits that "the nature of the legal question, whether a national consensus existed, defines the scope of the holding." In so arguing, the state directs us to language in *Atkins* leaving individual states the task of identifying those who "fall within the range of mentally retarded offenders about whom there is a national consensus." 536 U.S. at 317.

¶73        The state is correct that the core legal question resolved in *Atkins* was whether sufficient national "consensus" had developed for the Court to conclude that "'evolving standards of decency'" forbade the execution of the mentally retarded. *Id.* at 311-12, *quoting Trop v. Dulles*, 356 U.S. 86, 101 (1958). But the presence of a consensus implies a shared understanding of the topic of consensus. For this reason, the Court could not have plausibly suggested a national consensus about mental retardation if it believed the respective states could understand that term to mean markedly different things.[21]   Not surprisingly, then, no text in *Atkins* suggests any significant dispute

---

[21]Given that "mental retardation" is in fact a clinical term, rather than a politically defined term of art, the Court's assumption that each state shared that understanding of the term was not unreasonable. Although to the majority "it seems unlikely the Supreme Court would have delegated the interpretation of the Eighth Amendment to clinicians," *supra* ¶ 42, I find it more unlikely that the Court would have invited the states to

regarding the *definition* of "mental retardation" around which the Court found a national consensus had developed. To the contrary, at the outset of its opinion, the Court frames the issue presented in the trial court by quoting verbatim the clinical standards for diagnosing that condition. *Id.* at 308 n.3. And, as discussed, in the paragraphs immediately leading to the Court's holding, it expressly describes the logic and content of the national consensus with express reference to "clinical definitions" of mental retardation. *Id.* at 317-18. In so doing, the Court recites, for a second time in the opinion, the clinical definition itself. *Id.* Thus, there is little ambiguity as to the definition of mental retardation employed by the Court when describing the national consensus of attitudes toward the execution of the mentally retarded.

¶74      Nor does the Court's particular discussion of a "national consensus," *id.* at 316, suggest any other definition of mental retardation. In section III of the opinion, the Court exhaustively marshals the evidence of that consensus. *Id.* at 313-17. Therein, the Court separately itemizes (1) those states that had prohibited the practice of executing the mentally retarded, (2) those states that allowed the practice but had never done so, (3) those states that had done so rarely, and (4) the variety of religious and health organizations that had opposed the practice. *Id.* Notably absent in that discussion is any effort to qualify, modify, or redefine the meaning of the term "mental retardation" in any

substantially redefine the nature of the substantive restriction on their own authority to determine punishment. In context, it seems especially unlikely that the Court would have endowed lay legislators with the authority to substantially redefine a medical condition, when the Court's holding is itself anchored in the nature of the condition *as clinically described*.

47

of those contexts. Rather, the Court uses the term generically and in conformity with its preceding reference to the clinical definition. And, within the Court's discussion of national consensus, it applies clinical understandings of mental retardation when it presumes that those few individuals executed since *Penry v. Lynaugh*, 492 U.S. 302 (1989), with IQs below seventy, were mentally retarded. *Atkins*, 536 U.S. at 316.

¶75　　　In a lone footnote, the *Atkins* majority acknowledges some minor variation in statutory language used by states to define mental retardation. *See id*. at 317 n.22 ("The statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions set forth in n. 3, *supra*."). But, the Court notes that variation not to suggest any disagreement among the states as to the consensus understanding of what mental retardation entails, but rather to reinforce the conclusion that a true national consensus had coalesced around a shared definition of the condition—the "clinical definitions set forth in n. 3."[22] *Id.*

---

[22]As discussed above, the language of then § 13-703.02 suggests Arizona's legislature intended to express clinical understandings of mental retardation in statutorily defining the condition. And, the *Atkins* majority correctly identified that legislation as evidence of a trend against the execution of the mentally retarded. 536 U.S. at 315 n.15. But I cannot agree that, in so acknowledging the efforts of the respective states to statutorily prohibit the execution of the mentally retarded as evidence of evolving social norms, the Court intended to thereafter preclude any future conceivable specific Eighth Amendment challenge to those referenced statutes. Notably, the *Atkins* majority cited Kansas's statute as an example of the growing national consensus against executing the mentally retarded. 536 U.S. at 314 & n.12. But, as Justice Scalia emphasized in his dissent, Kansas's statutory definition of mental retardation would exclude the mildly mentally retarded, a group that Scalia acknowledges are now unambiguously exempted from execution by the holding of *Atkins*. *Id.* at 342-43 & 343 n.2 (Scalia, J., dissenting). Moreover, the majority clearly contemplates that the states would, as a response to its holding, be generating legislation designed to "enforce the constitutional restriction upon

¶76 Thus, there is no evidence in the Court's actual discussion of the national consensus that it intended to define "mental retardation" as a legal term of art, varying from state to state based on the political views of each state legislature, untethered to the accepted clinical definitions of that condition. Rather, within its discussion of national consensus, the Court logically employs the consensus definition of that term (and indeed its only recognized definition): a specific scientific classification of mental disability. In context, then, when the Court refers to a "range of mentally retarded offenders about whom there is a national consensus," *id.* at 317, it is referring to the spectrum of offenders that would be clinically defined as mentally retarded. It is not referring to a range of varying *definitions* of the condition.

¶77 Ultimately, when the *Atkins* Court held that evolving standards of decency placed "'a substantive restriction on the State's power to take the life' of a mentally retarded offender," *id.* at 321, *quoting Ford*, 477 U.S. at 405, implicit in that holding was the definition of mental retardation that the Court itself had set forth and repeatedly used in formulating its opinion, the only definition in existence around which a national consensus could develop.[23] Put another way, the Court's restriction on the states would

[their] execution of sentences." *Id.* at 317, *quoting Ford*, 477 U.S. at 416-17 (alteration in *Atkins*).

[23]The state and the majority observe that clinical definitions may evolve. The state therefore suggests it would have made little sense for the Court to adopt any particular clinical definition. Indeed, as noted, one of the two organizations providing a clinical definition at the time of *Atkins*, the AAMR, has since changed its own name, the name of the condition formerly called mental retardation, and the wording (but not the substance) of the definition of that condition. But the fact that the prevailing clinical definition of mental retardation could conceivably evolve does not demonstrate that the Court in

neither be effectively "categorical" nor "substantive" in the absence of a concrete definition of mental retardation.

**The Arizona Supreme Court has neither addressed nor resolved the issue.**

¶78　　　　Lastly, my colleagues maintain that the Arizona Supreme Court has already addressed and resolved the question here and that we are consequently bound by that decision. Specifically, they observe that in *Grell II*, our supreme court identified the primary differences between the statutory definition for mental retardation and the DSM-IV standard and nonetheless found no fault with the trial court's application of the statutory standard. *See Grell II*, 212 Ariz. 516, ¶¶ 62-63, 135 P.3d at 709.

¶79　　　　That passage, quoted at length in ¶ 53 *supra*, indeed identifies and articulates differences between the statutory definition of mental retardation and the clinical one. But it does not purport to address the question we must answer here: whether that deviation constitutes a violation of Eighth Amendment standards set forth by the United States Supreme Court in *Atkins*. The passage from *Grell II*, which addresses a challenge to the sufficiency of a trial court's findings under Arizona law, makes no mention of *Atkins*, the United States Constitution, or any other federal case law. *See* 212 Ariz. 516, ¶¶ 58-63, 135 P.3d at 708-09. It undertakes none of the reasoning necessary to consider whether *Atkins* requires substantial conformity to the clinical definition or

---

*Atkins* intended to eschew clinical definitions in favor of political ones. Unlike clinical definitions, which represent a widely accepted scientific consensus, the respective states have no duty to form any consensus definition of the condition. For this reason, state definitions of mental retardation would provide no jurisprudential stability at all except to the extent they incorporate recognizable clinical standards.

50

whether Arizona's statute, notwithstanding the noted deviations from the clinical definition, so conforms.

¶80        The majority speculates that the *Grell II* passage implicitly resolved the federal constitutional issue we face here because the court had addressed other analogous federal constitutional challenges to our statute in the same opinion. *See supra* ¶¶ 38-39. But, the discussion of the requirements of *Atkins* occurred in a separately headed section of the opinion and addressed only the authority of our state to erect its own procedural framework to enforce *Atkins*. *See Grell II*, 212 Ariz. 516, ¶¶ 21-49, 135 P.3d at 701-07. *Grell II* did not address the extent of the state's authority to redefine the class of persons eligible for execution under *Atkins*.

¶81        Finally, the majority suggests our supreme court resolved the question here when it observed in a footnote in a prior case that Arizona's statute "appears to comport substantively and procedurally with the principles set forth in *Atkins*." *Grell I*, 205 Ariz. 57, n.4, 66 P.3d at 1241 n.4. But that observation did not address any specific claim raised in the case before it, and was therefore dicta. Moreover, the court employed the phrase "appears to," suggesting it was not purporting to have definitively considered or resolved all future *Atkins*-based challenges to the statute. Indeed, when Grell later raised a host of claims that Arizona's procedural framework violated *Atkins*, the court exhaustively addressed those claims on their merits, and it declined to cite its previous footnote as authority for rejecting them. *See Grell II*, 212 Ariz. 516, ¶¶ 21-49, 135 P.3d at 701-07. Thus, the supreme court manifestly did not view itself as resolving any specific *Atkins*-based challenges to the statute when it authored the *Grell I* footnote.

51

¶82        Although we are bound by the holdings of our highest state court, I cannot assume our supreme court has resolved an issue of such gravity and legal complexity without engaging in any of the reasoning necessary to do so, without identifying the constitutional issue it was intending to address, and without citing the pivotal case controlling that issue. *See Calnimptewa v. Flagstaff Police Dep't*, 200 Ariz. 567, ¶ 24, 30 P.3d 634, 639 (App. 2001) (appellate opinions should not be read as authority for matters not "specifically presented and discussed"). Nor would such an assumption be consistent with our own rules for determining which claims have been properly presented by litigants and resolved by our courts. Claims based on state statute, state constitution, state common law, and federal constitutional law are not identical, even in the context of similar underlying facts, and it is not our courts' custom to decide distinct legal claims not raised by a party. *See, e.g.*, *State v. Ovante*, 231 Ariz. 180, ¶ 18 & n.1, 291 P.3d 974, 979 & n.1 (2013) (supreme court will review properly developed constitutional claims, but court "does not consider or address unsupported constitutional claims"); *State v. Tison*, 129 Ariz. 526, 535, 633 P.2d 335, 344 (1981) (constitutional issues precluded when not raised below, even though defendant objected to admission of evidence on other grounds); *State v. Alvarez*, 213 Ariz. 467, ¶ 7, 143 P.3d 668, 670 (App. 2006) (hearsay objection insufficient to preserve claim based on Sixth Amendment Confrontation Clause); *see also Ariz. State Bank v. Crystal Ice & Cold Storage Co.*, 26 Ariz. 205, 211, 224 P. 622, 623 (1924) (statutes presumed constitutional until question of constitutionality properly raised before court).

¶83 In determining what issues a court's holding has resolved, we must necessarily be guided, as all trial courts and attorneys must, by the court's own description of the issues it purports to be addressing and resolving. Thus considered, I cannot find any indication in either *Grell I* or *Grell II* that our supreme court intended to address or resolve the question now before us.

## Conclusion

¶84 My colleagues' scholarly rebuttal suggests some non-trivial explanations for why the Court in *Atkins* appeared to allow the respective states a measure of flexibility in defining mental retardation: respect for the salutary effects of federalism and the traditional deference owed the states in formulating punishments. But in my view, we must also recognize that the *Atkins* majority invited flexibility to enforce its holding, not eviscerate it. Nor can we overlook that the *Atkins* holding itself expressly places a substantive restriction on traditional state authority to determine punishment. Because Arizona's statutory standard for determining adaptive functioning would disqualify most mentally retarded persons from the protection of *Atkins*, it exceeds the bounds of any flexibility the Court intended to provide states in enforcing the constitutional restriction. I therefore respectfully dissent.

/s/ *Peter J. Eckerstrom*
PETER J. ECKERSTROM, Presiding Judge

## Appendix 1

### State Court Decisions Addressing Definitions of Mental Retardation after *Atkins*

| State | Did *Atkins* leave substantive definition of MR to states? | Source |
|-------|--------------------------------------------------------|--------|
| AL | Yes | *Morris v. State*, 60 So. 3d 326, 339 (Ala. Crim. App. 2010) |
| AR | Yes | *Anderson v. State*, 163 S.W.3d 333, 354-55 (Ark. 2004) |
| AZ | Yes | *State v. Grell*, 212 Ariz. 516, ¶¶ 24-25, 62, 135 P.3d 696, 701, 709 (2006) |
| CA | Yes | *People v. Jackson*, 199 P.3d 1098, 1107, 1109 (Cal. 2009) |
| CO | Yes | *People v. Vasquez*, 84 P.3d 1019, 1022 (Colo. 2004) |
| FL | Yes | *State v. Herring*, 76 So. 3d 891, 894 (Fla. 2011) |
| GA | Yes | *Stripling v. State*, 711 S.E.2d 665, 668 (Ga. 2011) |
| ID | Yes | *Pizzuto v. State*, 202 P.3d 642, 649 (Idaho 2008) |
| IL | Yes | *People v. Pulliam*, 794 N.E.2d 214, 236-37  (Ill. 2002) (but death penalty no longer available in Illinois) |
| IN | Yes | *Pruitt v. State*, 834 N.E.2d 90, 109-10 (Ind. 2005) |
| KY | Yes | *Bowling v. Commonwealth*, 163 S.W.3d 361, 376 (Ky. 2005) |
| LA | Yes | *State v. Turner*, 936 So. 2d 89, 92 (La. 2006) |
| MO | Yes | *State v. Johnson*, 244 S.W.3d 144, 150 (Mo. 2008) |
| MS | Yes | *Chase v. State*, 873 So. 2d 1013, 1027-28 (Miss. 2004) |
| NC | Yes | *State v. Poindexter*, 608 S.E.2d 761, 765 (N.C. 2005) |
| NJ | Yes | *State v. Jimenez*, 908 A.2d 181, 183, 189 (N.J. 2006) (but death penalty no longer available in New Jersey) |
| NM | Yes | *State v. Trujillo*, 160 P.3d 577, 581-82 (N.M. Ct. App. 2007) (but death penalty no longer available in New Mexico) |
| NV | Yes | *Ybarra v. State*, 247 P.3d 269, 273 (Nev. 2011) |
| OH | Yes | *State v. Were*, 890 N.E.2d 263, ¶¶ 175-76 (Ohio 2008) |
| OK | Yes | *Smith v. State*, 245 P.3d 1233, ¶ 3 (Okla. Crim. App. 2010) |

| State | Did *Atkins* leave substantive definition of MR to states? | Source |
|---|---|---|
| **PA** | Yes | *Commonwealth v. DeJesus*, 58 A.3d 62, 81 (Pa. 2012) |
| **SC** | Yes | *State v. Laney*, 627 S.E.2d 726, 730 (S.C. 2006) |
| **TN** | Yes | *Coleman v. State*, 341 S.W.3d 221, 234 (Tenn. 2011); *Howell v. State*, 151 S.W.3d 450, 457 (Tenn. 2004) |
| **TX** | Yes | *Ex parte Briseno*, 135 S.W.3d 1, 4-8 (Tex. Crim. App. 2004) (Supreme Court left procedure to states, absent Texas legislative enactment, adopting AAMR definition or definition in Texas Health and Safety Code) |
| **UT** | Yes | *State v. Maestas*, 2012 WL 3176383, ¶¶ 187-88 (Utah July 27, 2012) |
| **VA** | Yes, by implication | *Burns v. Commonwealth*, 688 S.E.2d 263, 264 (Va. 2010) |

# Appendix 2

## State Statutory Standards for Determining Mental Retardation

| State | Requires diminished intellectual ability? | Requires diminished adaptive behavior? | Requires 2+ diminished adaptive behavior? | IQ threshold? | Prior to Age | Source |
|---|---|---|---|---|---|---|
| AL | Yes | Yes | No | None | "Developmental period" | Ala. Code § 15-24-2(3) (defines MR for defendants generally, cited in *Morris v. State*, 60 So. 3d 326, 339 (Ala. Crim. App. 2010) for definition in capital prosecution) |
| AR | Yes | Yes | No | Presumption of MR at IQ of 65 | 18 | Ark. Code Ann. § 5-4-618 |
| AZ | Yes | Yes | No | 70 | 18 | A.R.S. § 13-753(K)(3), (5) |
| CA | Yes | Yes | No | No | 18 | Cal. Penal Code § 1376 |
| CO | Yes | Yes | No | No | "Developmental period" | Colo. Rev. Stat. § 18-1.3-1101 |
| CT | Yes | Yes | No | two standard deviations below mean | 18 | Conn. Gen. Stat. § 1-1g (death penalty no longer available in Connecticut) |
| DE | Yes | Yes | Yes | 70 | 18 | Del. Code Ann. tit. 11, § 4209(d)(3) |
| FL | Yes | Yes | No | two standard deviations below mean | 18 | Fla. Stat. § 921.137 |
| GA | Yes | Yes | No | No | "Developmental period" | Ga. Code Ann. § 17-7-131 |
| ID | Yes | Yes | Yes | 70 | 18 | Idaho Code Ann. § 19-2515A(1) |
| IN | Yes | Yes | No | No | 22 | Ind. Code § 35-36-9-2 |
| KS | Yes | Yes | No | two standard deviations below mean | 18 | Kan. Stat. Ann. §§ 21-6622(h); 76-12b01(d) |
| KY | Yes | Yes | No | 70 | "Developmental period" | Ky. Rev. Stat. Ann. § 532.130 |
| LA | Yes | Yes | No | No | 18 | La. Code Crim. Proc. Ann. art. 905.5.1(H)(1) |
| MD | Yes | Yes | No | 70 | 22 | Md. Code Ann., Crim. Law § 2-202(b)(1)(i)-(ii) |

| State | Requires diminished intellectual ability? | Requires diminished adaptive behavior? | Requires 2+ diminished adaptive behavior? | IQ threshold? | Prior to Age | Source |
|---|---|---|---|---|---|---|
| MO | Yes | Yes | Yes | No | 18 | Mo. Rev. Stat. § 565.030(6), *found unconstitutional on other grounds by State v. Whitfield*, 107 S.W.3d 253, 261 (Mo. 2003) |
| NC | Yes | Yes | Yes | 70 | 18 | N.C. Gen. Stat. Ann. § 15A-2005 |
| NE | Yes | Yes | No | Presumption of MR at IQ of 70 | None | Neb. Rev. Stat. § 28-105.01(3) |
| NM | Yes | Yes | No | Presumption of MR at IQ of 70 | None | N.M. Stat. Ann. § 31-9-1.6(E) (death penalty no longer available in New Mexico) |
| NV | Yes | Yes | No | No | "Developmental period" | Nev. Rev. Stat. § 174.098(7) |
| NY | Yes | Yes | No | No | 18 | N.Y. Crim. Proc. Law § 400.27(12)(e) (death penalty no longer available in New York) |
| OK | Yes | Yes | Yes | 70 | 18 | Okla. Stat. tit. 21, § 701.10b(A)-(B) |
| SC | Yes | Yes | No | No | "Developmental period" | S.C. Code Ann. § 44-20-30(12) (defines MR in health context, cited in death penalty case *State v. Stanko*, 2013 WL 696816, *16 (S.C. Feb. 27, 2013)) |
| SD | Yes | Yes | No | Presumption of no MR if IQ greater than 70 | 18 | S.D. Codified Laws §§ 23A-27A-26.1, 23A-27A-26.2 |
| TN | Yes | Yes | No | 70 | 18 | Tenn. Code Ann. § 39-13-203 |
| TX | Yes | Yes | No | two standard deviations below mean | "Developmental period" | Tex. Code Ann. § 591.003 (defines MR in health and safety code, adopted as part of standard in death penalty cases, *Ex parte Hearn*, 310 S.W.3d 424, 427-28 (Tex. Crim. App. 2010)) |
| UT | Yes | Yes | No | No | 22 | Utah Code Ann. § 77-15a-102 |
| VA | Yes | Yes | No | two standard deviations below mean | 18 | Va. Code Ann. § 19.2-264.3:1.1(A) |
| WA | Yes | Yes | No | 70 | 18 | Wash. Rev. Code § 10.95.030(2) |